UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Criminal Misc. No. 12- |
| | ) | |
| JONATHAN M. HARGETT, | ) | |
| | ) | |
| Defendant. | ) | |

## AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT AND ARREST WARRANT

I, Richard Pandis, having been duly sworn and appointed as a Special Agent of the U.S.

Office of Personnel and Management, Office of Inspector General ("OPM-OIG") do hereby state

as follows:

### INTRODUCTION

1.      I am a Special Agent with the OPM-OIG and have been so employed for more

than eight years. I have been assigned to the Los Angeles Field office since January 01, 2005.

Prior to that, I was employed as a Police Officer with Cobb County Police Department

("CCPD") in Atlanta Georgia. There I was assigned as a patrol officer and field training officer,

enforcing Georgia State Law. I obtained my intermediate Police Officer Standards and Training

("POST") certificate while with CCPD. I also was employed with the Los Angeles Police

Department and hold a basic POST certificate in the state of California. In 2003 I re-certified as

a Police Officer in the state of California by attending the Orange County Sheriff's academy. I

completed the Federal Law Enforcement Training Center course for a criminal investigator in

May 2005. I am a Lieutenant Commander in the Navy Reserves, where I was assigned to Naval

Criminal Investigative Service. There I conducted complex investigations in Counter Terrorism

and Counter Intelligence. Recently I have returned from being the lead fact investigator for

Office of Military Commissions, Office of the Chief Defense Counsel, responsible for the prosecution and defense for High Value Detainees at Guantanamo Bay, Cuba. I have a Bachelors of Arts in Criminal Justice and a Master's degree in Public Administration. I am the case agent assigned to investigate allegations of fraud, waste and abuse against the Federal Employee Retirement System, the Civil Service Retirement System, and the Federal Employee Health Benefits Program. I have prepared affidavits for arrest warrants and search warrants in California and Georgia. I have completed an estimated 100 affidavits for arrest warrants in my total law enforcement career.

2.      This affidavit is made in support of an application for an arrest warrant for JONATHAN MATTHEW HARGETT ("**HARGETT**"). This affidavit contains only information necessary to support probable cause for an arrest warrant to be issued for **HARGETT**. It is not intended to include each and every fact and matter observed by me or known to the Government.

3.      The facts and information contained in this affidavit are based upon my personal knowledge of the investigation, information provided to me by other law enforcement officers, information provided by witnesses, information gained from physical surveillance, and other information gathered during the course of the investigation, including information provided from other agents with OPM-OIG, the Department of Veterans Affairs Office of Inspector General ("VA-OIG"), the Defense Criminal Investigative Service ("DCIS"), and the U.S. Army Criminal Investigative Division ("CID"), among others.

### Relevant Statutes

4.      Title 18, United States Code, Section 1347 (Health Care Fraud), makes it unlawful for anyone to knowingly and willfully execute or attempt to execute a scheme or

artifice: (a) to defraud any health care benefit program; or (b) to obtain, by means of false or fraudulent pretenses, representations, or promises, any of the money or property owned by, or in the custody or control of any health care benefit program. The term "health care benefit program" is defined in Title 18, United States Code, Section 24(b) as "any public or private plan or contract, affecting commerce, under which any medical benefit, item, or service is provided to any individual, and includes any individual or entity who is providing a medical benefit, item, or service for which payment may be made under the plan or contract."

5.     Title 18, United States Code, Section 1343 (Wire Fraud), makes it unlawful for any person, having devised or intended to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, to transmit or cause to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, sign, signals, pictures, or sounds for the purpose of executing such scheme or artifice.

6.     Title 18, United States Code, Section 1035 (False Statements Relating to Health Care Matters) makes it unlawful for any person, in any matter involving a health care benefit program, to knowingly and willfully— (1) falsify, conceal, or cover up by any trick, scheme, or device a material fact; or (2) make any materially false, fictitious, or fraudulent statements or representations, or make or use any materially false writing or document knowing the same to contain any materially false, fictitious, or fraudulent statement or entry, in connection with the delivery of or payment for health care benefits, items, or services.

7.     Title 18, United States Code, Section 1957(a) makes it unlawful to knowingly engage or attempt to engage in a monetary transaction in criminally derived property of a value greater than $10,000 and is derived from specified unlawful activity.

3

8.      Pursuant to 18 U.S.C. § 982(a)(7), in the event of **HARGETT**'s conviction of a health care fraud scheme and/or false statements relating to health care matters, **HARGETT** shall be subject to forfeit to the United States any property, real or personal, that constitutes or is derived directly or indirectly, from gross proceeds traceable to the commission of a health care fraud scheme, in violation of 18 U.S.C. § 1347, and/or the commission of false statements relating to health care matters, in violation of 18 U.S.C. § 1035, including, but not limited to, any specific property traceable to these offenses.  In the event that **HARGETT** is convicted of wire fraud, in violation of Title 18, United States Code, Section 1343, **HARGETT** shall be subject to forfeit to the United States any and all property, real or personal, which constitutes or is derived from proceeds traceable to wire fraud, pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c).  In the event that **HARGETT** is convicted of engaging in monetary transactions in property derived from specified unlawful activity, in violation of Title 18, United States Code, Section 1957(a), **HARGETT** shall be subject to forfeit to the United States any property, real or personal, involved in such offense or any property traceable to such property.   The United States may also request the imposition of a forfeiture money judgment equal to the value of the forfeitable property.  If any of the property described above as being subject to forfeiture, as a result of any act or omission of **HARGETT**, (a) cannot be located upon the exercise of due diligence; (b) has been transferred or sold to, or deposited with, a third party; (c) has been placed beyond the jurisdiction of the Court; (d) has been substantially diminished in value; or (e) has been commingled with other property that cannot be divided without difficulty, **HARGETT** shall forfeit to the United States any other property belonging to him, up to the value of the property described above, pursuant to Title 21, United States Code, Section  U.S.C. § 8853(p).

4

**<u>Relevant Health Care Benefit Programs</u>**

9.      The Federal Employee Health Benefit Program ("FEHBP") was a health care

benefit program funded by the federal government that offered health care benefits, items, and

services for federal employees, retirees, and their eligible spouses and dependents.  The U.S.

Office of Personnel Management ("OPM") contracted with a number of private insurance

companies to administer the FEHBP.  These companies processed and paid health care claims on

behalf of OPM.  OPM reimbursed the contracted health insurance companies for 100% of the

amount of the health care claims they paid and 100% of their administrative expenses, plus a

negotiated service charge.  The funds to pay the companies were drawn from an OPM trust fund

account at the United States Treasury.  The trust fund account was funded primarily by the

federal government, but approximately 27% of the fund was comprised of health insurance

premiums paid by individual federal employees.

10.     Federal employees stationed overseas had the option to choose the Foreign

Service Benefit Plan ("FSBP") as their health care benefit program.  FSBP was a "health care

benefit program" as defined in Title 18, United States Code, Section 24(b).  OPM contracted

with Coventry Health Care ("COVENTRY") in the District of Columbia to administer the FSBP.

Generally, employees stationed overseas and enrolled in FSBP paid out-of-pocket for the health

care benefits, items, or services they received and then submitted claims for reimbursement to

COVENTRY via facsimile or mail.  COVENTRY processed the claims and paid the employee

directly, either with a check sent through the U.S. Postal Service or through electronic direct

deposit to the employee's bank account.

11.    The United States Department of Veterans Affairs ("VA") provided health care benefits, items, and services to certain U.S. veterans with qualifying service-connected conditions. To be eligible to receive VA disability benefits and/or VA health benefits after discharge from active service, a veteran must have been honorably discharged with a disability that was incurred or aggravated during military service. For veterans working or residing abroad, the VA provided this health care coverage through its Foreign Medical Program ("VA-FMP"). The VA-FMP was a "health care benefit program" as defined in Title 18, United States Code, Section 24(b).

12.    Veterans eligible for VA-FMP coverage and in need of medical care overseas paid out-of-pocket for their health care benefits, items, and services and then submitted claims for reimbursement to VA-FMP in Denver, Colorado, via facsimile or mail. The VA-FMP reimbursed veterans using checks sent directly to the veteran through the mail.

### The Defendant

13.    From 1996 through 2012, defendant **HARGETT** was a United States citizen working in various positions as a civilian employee for the Department of Defense ("DoD") in Germany. Most recently, from January 2011 through May 2012, defendant **HARGETT** was an Intelligence Analyst with Headquarters, U.S. Army Europe, Intelligence Surveillance and Reconnaissance Directorate, in Heidelberg, Germany. Previously, **HARGETT** had served in the U.S. Army from 1992 to 1996.

14.    On or about December 13, 2002, defendant **HARGETT** enrolled in the FSBP as a federal employee stationed overseas. From on or about December 13, 2002, through on or about May 31, 2012, defendant **HARGETT** was enrolled in and submitted claims to the FSBP.

15.   Because of his prior service in the U. S. Army, Defendant **HARGETT** was also eligible for health care coverage from the VA.  Defendant **HARGETT** applied for and obtained disability compensation with the VA in 1996, and on or about November 24, 2004, defendant **HARGETT** enrolled in the VA-FMP.  Defendant **HARGETT** was enrolled in and submitted claims to the VA-FMP through at least April 2012.

16.   Defendant **HARGETT** submitted most of his claims for reimbursement to COVENTRY via wire transmissions in foreign commerce – specifically, facsimiles sent from Germany to the District of Columbia.

17.   Defendant **HARGETT** submitted his claims for reimbursement to the VA-FMP via wire transmissions in foreign commerce – specifically, facsimiles sent from Germany to Colorado – and via interstate mail sent from Germany and delivered in Colorado by the United States Postal Service.

## PROBABLE CAUSE

### Investigation Background

18.   On or about August 22, 2011, **HARGETT** submitted via facsimile a claim for reimbursement to COVENTRY.  The claim submission included a supporting invoice from the Apotheke im Hauptbahnhof ("Apotheke"), a pharmacy in Darmstadt, Germany, purporting to show that **HARGETT** had purchased €42.103,69[1] worth of drugs and pharmaceutical items on August 11, 2011.

19.   On or about February 9, 2012, COVENTRY sent a facsimile to the Apotheke, requesting confirmation on whether or not **HARGETT** had purchased the items.  After reviewing the invoice, the pharmacy manager determined it was a forgery and contacted the local

---

[1] When describing an amount in euros, a decimal point is used instead of a comma and vice versa; for instance, ten thousand euros would be "€10.000,00."

German police.  The pharmacy manager explained to the police that the Apotheke had changed its invoice format in May 2011, but this invoice purportedly from August 11, 2011, used the old format and was therefore not prepared by the Apotheke; the Apotheke had also not invoiced anything on August 8, 2011.  The pharmacy manager reviewed the individual items on the invoice and determined that the Apotheke had not dispensed any of them to **HARGETT**.

20.     Soon thereafter the Apotheke received a U.S. Treasury check from VA-FMP in the amount of $47,790.73.  The check was payment for a claim submitted by **HARGETT** and had inadvertently been mailed to the Apotheke instead of **HARGETT**.

21.     On or about March 22, 2012, **HARGETT** sent an email to the Apotheke, advising him that they would be receiving the check, and requesting that they endorse the check and return it to him.

22.     On or about March 23, 2012, COVENTRY notified OPM-OIG and VA-OIG of suspected fraudulent health care billings submitted by **HARGETT** to FSBP.   Specifically, COVENTRY informed OPM-OIG and VA-OIG that the Apotheke had received a U.S. Treasury check for $47,790.73 from the VA-FMP.

23.     On March 27, 2012, the local German police re-interviewed the Apotheke office manager and notified CID that they had opened a forgery and fraud investigation against **HARGETT**.

24.     On April 4, 2012, the local German police executed court-issued search warrants on **HARGETT**'s person, vehicle, and residence.  The search warrant executions were witnessed by agents from CID and DCIS.  Among the items seized from **HARGETT**'s person, residence, and vehicle were:

- Four silver bars and two gold bars;

- €60.035,00[2] and $3,100.00 in cash;

- Automobile sales contract for an Audi Q7 and a check in the amount of €79.831,93 for Audi Zentrum Heidelberg;

- "Forged bill" for €44.588,43;

- Various binders containing medical bills and insurance claims;

- Prescriptions, bills, and medical documents;

- Bank account statements from Service Credit Union, Sparkasse Bank, and ING-DiBa Bank; and

- Binder labeled "Garage" with building applications/plans for the construction of a new residence.

25.    VA-OIG confirmed that some of the Treasury checks from the VA-FMP to **HARGETT** were deposited into **HARGETT**'s account with Service Credit Union, a credit union that was based in New Hampshire but had branches on U.S. military installations in Germany.  On or about April 19, 2012, the United States obtained a seizure warrant from the U.S. District Court for the District of Colorado and served that warrant on Service Credit Union. In response to the warrant, on or about April 20, 2012, Service Credit Union forwarded to the Government a check for $595,656.06.

26.    Effective July 13, 2012, **HARGETT**'s employment with DoD was terminated.

### Summary of the Health Care Fraud Scheme

27.    There is probable cause to believe that **HARGETT** engaged in a multi-million dollar scheme to defraud COVENTRY and the VA-FMP by submitting false claims for services and items that were not provided, and supporting those claims with fake invoices that he forged

---

[2] At the time of signing this Affidavit, one euro was worth approximately US $1.30; however, wherever possible, this Affidavit uses the conversion rate in effect at the time a specific claim was submitted or transaction was made.

and bank transfers that **HARGETT** forged purporting to show that he had already paid the fake invoices and was thus entitled to reimbursement.

28.     The false claims at issue were for services or items allegedly provided by the Apotheke or by "Dr. C," a physician in Germany who was treating **HARGETT**, or by one of two entities owned and controlled by Dr. C.

29.     In addition to the claim forms submitted to COVENTRY and VA-FMP, **HARGETT** would also submit documents that purported to be (1) invoices from the Apotheke and from Dr. C. **HARGETT** and (2) bank wire transfers purporting to show that **HARGETT** had transferred money in the amount of the invoice to the provider. Most if not all of these documents were fake.

30.     Most of the false claims **HARGETT** submitted to COVENTRY and VA-FMP using facsimile were transmitted by **HARGETT** using the facsimile machine in his DoD office on a U.S. Army base in Germany.

31.     As described below, **HARGETT** submitted approximately €1.7 million (approximately $2.2 million) in false claims to federal health care benefit programs; **HARGETT** was paid approximately **$2.2 million** for those false claims.

### False Dr. C Claims

32.     From in or around May 2007, through on or about February 3, 2012, **HARGETT** submitted to VA-FMP at least 40 claims totaling approximately €83,708.03 (approximately $106,374.79[3]) for services and items Dr. C allegedly provided to **HARGETT**. The alleged dates of services for these claims ran from January 11, 2007, through December 16, 2011.

---

[3] **HARGETT** submitted his claims in euros and provided euro-dollar conversions; once they received **HARGETT's** claims, COVENTRY and VA-FMP converted the euros into dollars based on exchange rates then in effect, and paid the claims in dollars. Thus, in this Affidavit specific paid amounts are precise in dollars, billed amounts are precise

33.     VA-FMP paid **HARGETT** at least $99,425.55 for these claims; another $15,825.41 was inadvertently sent directly to Dr. C, who (not knowing they were for fraudulent claims) then signed them over to **HARGETT**. **HARGETT** thus received approximately $115,250.96 in payments for these claims.

34.     From in or around April 2006, through on or about January 31, 2012, **HARGETT** submitted to COVENTRY at least 81 claims totaling approximately €629.891,33 (approximately $931,021.23) for hospital and outpatient medical services allegedly provided to **HARGETT** in Germany from April 19, 2006, through December 16, 2011. COVENTRY on behalf of OPM-FSBP paid **HARGETT** at least $903,771.81 for those claims.

35.     Of the 81 total claims **HARGETT** submitted to COVENTRY for outpatient services, at least 67 claims totaling approximately €578.735 (approximately $805,006) were for outpatient medical services allegedly provided by Dr. C and his clinics. COVENTRY on behalf of OPM-FSBP paid **HARGETT** approximately $790,488.34 for those claims.

36.     On November 9, 2012, the local German police, joined by agents from CID, DCIS, VA-OIG, and OPM-OIG interviewed Dr. C. Dr. C reviewed claims submitted by **HARGETT** for services that Dr. C had allegedly provided, and Dr. C stated the claims were false.

37.     Dr. C confirmed that he was treating **HARGETT**. However, he explained this his patients would only be billed by the Apotheke for infusion drugs, not injections like the drugs at issue here. The Hyalubrix, Orthovisc, Ostensil, Synvisc, Viscorneal, and Xylonest identified on **HARGETT**'s claims to VA-FMP and COVENTRY are all purchased by Dr. C (directly or

---

in euros, and for easy comparison the approximate billed amount was provided in dollars based on the then-existing exchange rate.

through one of his companies), delivered to and dispensed by Dr. C, and then Dr. C's office bills the patients for the drugs directly.

38.     Dr. C also reviewed the dosages on the claims submitted by **HARGETT** and determined that they far exceeded appropriate dosages.  For example, **HARGETT** claimed he had purchased 100-150 dosages a month for himself, of each drug, whereas Dr. C told agents that Dr. C would use that quantity of drugs to treat approximately 2,000 patients over a one month period, and that the volume of drugs allegedly purchased by **HARGETT** as reflected on his claim forms was not legitimate.  Dr. C also confirmed that because they are used for the same treatment, typically the drugs are not administered together.

39.     Dr. C stated that he estimated the total charges for **HARGETT**'s treatments from 2006 to 2012, including the drugs, was between €30.000 and €50.000 (approximately $39,000 to $65,000) – far less than the approximately €1.766.443 (approximately $2.2 million) for which **HARGETT** had submitted claims for reimbursement.

40.     Finally, Dr. C provided copies of his actual invoices to **HARGETT**; comparison of the invoices with the ones submitted by **HARGETT** further confirmed the falsity of the claims submitted by **HARGETT** and identified herein.

<u>**False Apotheke Claims**</u>

41.     From April 7, 2011, through February 3, 2012, **HARGETT** submitted to VA-FMP at least 18 claims totaling €982.747,72 (approximately $1,345,624.41) for items **HARGETT** purportedly purchased from the Apotheke.  The alleged dates of services for these claims ran from January 5, 2009, through January 19, 2012.  If these dates of service were accurate, and the items had actually been provided and paid for by **HARGETT** as claimed, that

would mean that **HARGETT** waited more than two years after he paid for the items to submit many of his claims for reimbursement.

42.     VA-FMP paid **HARGETT** at least $1,099,673.68 for these claims; another approximately $90,335.10 was sent directly to the Apotheke, totaling approximately $1,187,008.78 in payments for those claims.

43.     From on or about March 18, 2011, through on or about August 11, 2011, **HARGETT** submitted to COVENTRY at least four claims totaling approximately €121.253,73 (approximately $182,463.24), for pharmacy items that **HARGETT** allegedly purchased from the Apotheke from January 13 through August 11, 2011.

44.     COVENTRY on behalf of OPM-FSBP paid **HARGETT** approximately $116,417.38 for those claims.

45.     Most if not all of the false Apotheke pharmacy claims submitted by **HARGETT** to COVENTRY and VA-FMP included six drugs:  Hyalubrix, Orthovisc, Ostensil, Synvisc, Viscorneal, and Xylonest.  Xylonest is an injectable local anesthetic; the other five drugs are all variations of the same drug typically used to treat osteoarthritis of the knee.  According to information from the drug manufacturers, confirmed by COVENTRY's medical director and a Staff Pharmacist, U.S. Army Medical Clinic, Wiesbaden, Germany, the drugs are typically injected once a week, three to five times, in dosages of about 2 ml; that course of treatment lasts from six months to a year.  As explained below, the volumes of drugs allegedly purchased by **HARGETT** from the Apotheke and administered by Dr. C grossly exceeds those approved treatments.

46.     On November 9, 2012, the local German police, joined by agents from CID, DCIS, VA-OIG, and OPM-OIG, also interviewed the pharmacy manager of the Apotheke.  She

reviewed 27 of the invoices **HARGETT** submitted to VA-FMP and determined they were all fraudulent; she also reviewed five of the invoices **HARGETT** submitted to COVENTRY and determined four of them were false.

47.     The Apotheke manager explained that the Apotheke had changed its invoice format in May 2011, and all but one of the invoices after May 2011 used the old format, meaning the Apotheke did not create those invoices; one invoice, dated in January 2011, used the new format, even though the new format hadn't been implemented by the Apotheke until four months after that.  Some invoices even misspelled "Apotheke."

48.     The Apotheke manager further confirmed what Dr. C had separately stated, that with the types of drugs being claimed by **HARGETT**, the Apotheke would dispense the drugs directly to the physician, who would then administer and bill for the drugs, although she did not know if Dr. C had bought any of these specific drugs for **HARGETT** or not.  She also explained that the volume of drugs claimed by **HARGETT** for a single month was the equivalent to what the Apotheke ordered for all of its patients in a month, and the quantities were far too high for one individual patient.

49.     Finally, the manager reviewed her records and told agents that the most expensive drug or invoice actually billed by the Apotheke to **HARGETT** and paid by **HARGETT** was less than €292 (approximately $379); anything over that amount was false.

50.     After reviewing its records, the Apotheke confirmed that it had only invoiced **HARGETT** for a total of €1.392,69 (approximately $1,809) – meaning the other approximately €1.067.156,22 (approximately $1,387,302) in Apotheke claims that **HARGETT** submitted to COVENTRY and VA-FMP were completely false.  For example, the Apotheke identified the following claims as false:

Case 1:13-cr-00295-RLW   Document 1-1   Filed 04/04/13   Page 15 of 19

| Invoice Date | Amount (€ Eur) | Approximate USD $ | Amount Paid (USD $) | Claim Submitted To | Date Claim Submitted | Method of Submission |
|---|---|---|---|---|---|---|
| 1/13/11 | €24.998.20 | $36,416.34 | $33,390.37 | COVENTRY | 3/18/11 | Facsimile |
| 12/08/09 | €32.121.76 | $40,779.12 | $40,779.12 | VA-FMP | 5/10/11 | Facsimile |
| 5/06/11 | €31.813,98 | $49,239.99 | $49,239.99 | COVENTRY | 5/13/11 | Facsimile |
| 1/05/09 | €40.701.83 | $56,741.78 | $56,741.78 | VA-FMP | 5/20/11 | Facsimile |
| 6/06/11 | €22.339,98 | $33,787.02 | $33,787.02 | COVENTRY | 6/09/11 | Facsimile |
| 9/21/10 | €41.177.87 | $53,842.89 | $53,735.67 | VA-FMP | 12/02/11 | Facsimile |

51.     In addition, on March 20, 2013, a forensic analysis of **HARGETT**'s government computer was completed.  The computer had been seized and searched pursuant to a Military Magistrate's Search Authorization issued on April 4, 2012.  The forensic analysis uncovered evidence of numerous files and emails relating to claims for the Apotheke and Dr. C and submitted to COVENTRY and VA-FMP; however, most of the documents had been deleted.

52.     One of the documents that forensic analysis was able to recover was a Microsoft Word document created on **HARGETT**'s computer that purports to be an invoice from the Apotheke, dated February 7, 2011, for drugs including Hyalubrix, Orthovisc, Ostensil, Synvisc, and Xylonest, totaling €35,381.09.  On June 27, 2011, **HARGETT** submitted to the VA-FMP via facsimile as part of his claim an invoice purportedly from the Apotheke, dated February 7, 2011, for €39,518.82.  The VA-FMP paid **HARGETT** $53,274.67 for that claim, which the Apotheke confirmed was false.

### HARGETT'S Confession

53.     On June 19, 2012, **HARGETT** gave a consensual interview to the local German police.  His attorney was present, and before the interview began **HARGETT** was advised of his

rights under German law. **HARGETT** was offered but waived the services of an interpreter, so the interview was conducted in German, which **HARGETT** spoke fluently. An investigator from DCIS was also present.

54.    During the interview, **HARGETT** admitted to having submitted false claims and forged invoices and bank transfer records to COVENTRY and the VA-FMP. **HARGETT** told the local German police that he submitted the false claims to COVENTRY because he did not want his "children to grow up in poverty."[4] **HARGETT** also told the local German police that he submitted the false claims to the VA-FMP because he was building a house that cost €200.000,00 but the construction had run into problems, and those problems could cost an additional €250.000,00: "But instead of backing out of this matter [the house construction] and having a reasonable talk with my wife, I started the scheme with the Foreign Medical Program."

55.    During the interview, **HARGETT** was shown a number of the false claims he submitted to COVENTRY and VA-FMP as well as some of the supporting invoices and bank transfers he forged. After being shown each of the exhibits and reviewing them with his lawyer, **HARGETT** would admit guilt with responses such as "This is a total forgery I made and submitted to the VA" or "This is obviously a total forgery I made out and submitted to the Foreign Service Benefit."

56.    Of the documents he was shown, **HARGETT** confessed that at least 55 of the 66 claims he submitted for items allegedly provided by the Apotheke, and 45 of the 46 he submitted for services allegedly provided by Dr. C., were completely false.

57.    During the interview, **HARGETT** was also asked if he was willing to forfeit his rights to the property seized in the searches. He responded, "Yes, I renounce possession of the

---

[4] Direct quotations from **HARGETT**'s statement are taken from the English translation provided by U.S. Army Legal Office, Wiesbaden, Germany.

confiscated assets. I agree that they may be returned to the injured parties." **HARGETT** also stated that he only submitted false claims to COVENTRY and VA-FMP, that they were the only defrauded parties.

**MONEY LAUNDERING AND FROZEN ASSETS**

58.    **HARGETT** has already dissipated and transferred hundreds of thousands of dollars in fraudulent proceeds, including more than €310.000 (approx. $403,000) to accounts held in his wife's name. For example, **HARGETT** made the following cash withdrawals and transfers from his Service Credit Union account:

| DATE | AMOUNT (EUR) | APPROXIMATE USD $ | TRANSFER TO |
|---|---|---|---|
| 1/22/09 | €30.000 | $39,735 | **HARGETT**'s NorisBank account |
| 2/3/09 | €37.500 | $49,173 | **HARGETT**'s ING Bank account |
| 8/1/11 | €65.000 | $95,672 | Annett **HARGETT**'s NorisBank account |
| 9/6/11 | €20.000 | $29,235 | Annett **HARGETT**'s PostBank account |
| 9/7/11 | €20.000 | $29,065 | Annett **HARGETT**'s PostBank account |
| 9/13/11 | €55.000 | $77,128 | Annett **HARGETT**'s NorisBank account |
| 9/21/11 | €10.000 | $13,816 | Cash withdrawal |
| 9/23/11 | €62.750 | $86,695 | Annett **HARGETT**'s NorisBank account |
| 9/27/11 | €27.500 | $37,994 | Cash withdrawal |
| 12/13/11 | €35.000 | $48,356 | Cash withdrawal |

| 3/8/12 | €70.250 | $94,600 | Annett HARGETT's NorisBank account |
|--------|---------|---------|-----------------------------|

59.     In addition, there is reason to believe that **HARGETT** knowingly engaged in monetary transactions, affecting interstate commerce in criminally derived property of a value greater than $10,000, by transferring funds from his Service Credit Union accounts to make a number of purchases or attempted purchases.  For example, **HARGETT** initiated the following transactions using funds from his Service Credit Union savings account:

| DATE | AMOUNT (EUR) | APPROXIMATE USD $ | PURCHASE |
|------|--------------|-------------------|----------|
| 2/01/12 | €27.815,00 | $37,424.96 | Fireplace |
| 3/22/12 | €60.081,50 | $81,184.24 | Mercedes Benz |
| 4/03/12 | €79.831,93 | $109,078.91 | Audi |

60.     Prior to these transactions, **HARGETT** had significant deposit activity of fraudulently obtained funds from the U.S. Treasury into his Service Credit Union savings account.  For example, between January 2012 and April 3, 2012, **HARGETT**'s Service Credit Union savings account received deposits totaling over $500,000 from the U.S. Treasury.  During that three-month time period, **HARGETT**'s savings account balance was maintained at over $10,000 on any given day.

61.     Subsequent to **HARGETT**'s arrest, the German court ordered an *in rem* attachment against **HARGETT**'s assets in the amount of €1.049.695,81.  Pursuant to that order, the following assets were provisionally seized and are under the control of the German court (in addition to the assets seized during the execution of the search warrants):

- €33.380,24 from Deutsche Bank;

- €209.562,72 from Norisbank;

- €28.202,18 from ING; and

- €60.081,50 (money paid from **HARGETT** to Mercedes Benz).[5]

## CONCLUSION

62.     I believe the above-mentioned facts establish probable cause to believe that the

individual known as **JONATHAN MATTHEW HARGETT** has committed health care fraud

in violation of 18 U.S.C. § 1347; false statements relating to health care matters in violation of

18 U.S.C. § 1035; wire fraud in violation of 18 U.S.C. § 1343; and money laundering in

violation of 18 U.S.C. § 1957(a).


I declare under penalty of perjury that the foregoing affidavit in support of arrest warrant

of Jonathan M. Hargett is true and correct to the best of my knowledge and belief.

_____
Richard Pandis
Special Agent
Office of Personnel and Management
Office of Inspector General

Sworn and subscribed to before me
this ___ day of April, 2013.


_____
DEBORAH A. ROBINSON
United States Magistrate Judge
District of Columbia

---

[5] Using today's exchange rates of approximately €1 = $1, the German court is holding or controlling a total of approximately $615,521, plus the bars of gold and silver that have not yet been valued.